UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA REEDER,<br>Plaintiff<br><br>V.<br><br>SUN LIFE ASSURANCE COMPANY OF<br>CANADA, INC.<br>Defendant | CIVIL ACTION NO. 05-10534-NMG |

### SUN LIFE ASSURANCE COMPANY OF CANADA, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

In support of its Motion for Summary Judgment and pursuant to Local Rule 56.1, the defendant, Sun Life Assurance Company of Canada, Inc. ("Sun Life"), submits the following concise statement of the material facts of record as to which it contends there is no genuine issue to be tried.

1.  In May 2003, Laura Reeder ("Ms. Reeder") was employed as a Research/Adjuster Analyst for Sun Life Assurance Company of Canada (U.S.) ("Sun Life U.S."). She had been employed with Sun Life U.S. for approximately 18 years. Administrative Record p.0076.[1]

2.  A the time she filed her claim, Ms. Reeder was 43 years old and covered under Sun Life U.S.' employee welfare benefit plan ("the Plan"). The Plan was funded by a group policy issued by Sun Life.[2] The Plan provided long-term disability ("LTD") benefits.

3.  Under the Plan, Total Disability for long-term disability means that:

---

[1] All reference to the Administrative Record will be AR-0XXX and are contained in the volumes of the Administrative Record which were filed with the Court on November 18, 2005.
[2] Sun Life U.S. is plaintiff's employer. Sun Life is the insurer that issued the group policy to Sun Life U.S., the employer. They are two separate corporations.

{H:\PA\Lit\15928\55022\A0931916.DOC}

> During the Elimination Period and the next 24 months . . . the Employee because of Injury or Sickness is unable to perform all of the material and substantial duties of his own occupation. (AR-0009).

4. To qualify for LTD benefits the employee must:

   1. Satisfy the Elimination Period with the required days of Total or Partial Disability;

   2. Provide proof of continued Total or Partial Disability; and

   3. Have regular and continuing care by a physician who provided appropriate treatment by means of examination and testing in accordance with the disabling condition.

5. The Elimination Period means a period of continuous days of total or partial disability for which no LTD benefit is payable. (AR-0008).

6. Under the Plan, the Elimination Period is 180 days. (AR-0003). Therefore, an employee must be continuously totally disabled for 180 days and be receiving regular and appropriate medical care for the disabling condition before any LTD benefit is due.

7. According to the Plan, Sun Life must receive Notice and Proof of Claim prior to any payment under the Policy. (AR-0027). Proof of Claim under the Policy "must be satisfactory to Sun Life." (AR-0027).

8. In July 2003, Ms. Reeder submitted a claim to her employer, Sun Life U.S. for short-term salary continuance because she claimed to be unable to work as of May 15, 2003 due to an open cholecystectomy for her gallbladder, which took place on May 31, 2003 and Crohn's Disease. (AR-0070).

9. Ms. Reeder was paid short-term salary continuance by her employer, Sun Life U.S. through November 9, 2003. (AR-0159).

10. On October 22, 2003, Ms. Reeder filed a claim for long-term disability benefits under the group policy insured by Sun Life. (AR-0217-025). Ms. Reeder claimed to be totally

disabled due to Crohn's Disease. She stated that she had suffered from Crohn's Disease since 1985. (AR-0217).

11. In her Employee Statement, Ms. Reeder identified her occupation as a "Research/Adjustment Analyst." (AR-0217).

12. According to the Employer's Statement, Sun Life U.S. stated that each day Ms. Reeder's position required her to sit for 5.5 hours, stand for half an hour, and walk for up to one hour, and do some occasional bending or stooping. She was not required to climb, kneel, balance, push/pull or crawl/crouch. (AR-0216-C).

13. Ms. Reeder's primary responsibilities included:

- Ensure accuracy and quality of work performed in the group by assisting in quality monitoring and feedback process;
- Resolve complex research questions and issues by serving as a technical expert to the group;
- Ensure thorough records are maintained by documenting all actions taken to research and resolve transactions;
- Ensure accurate and timely processing of all complex research and correspondence requests by gathering and analyzing relevant information, taking appropriate actions for resolving and communicating research results to request origination;
- Ensure trends are identified and acted upon by performing trend analysis and reporting to Administrative Services Manager and providing feedback to employees.

(AR-0216-G).

14. The Dictionary of Occupational Titles (DOT) published by the Department of Labor, defines sedentary work as "exerting 10 pounds of force occasionally. . .. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." (AR-0398).

15. Dr. Greta Taitelbaum, Ms. Reeder's gastroenterologist, submitted an Attending Physician Statement ("APS") in connection with Ms. Reeder's LTD claim. She listed Ms. Reeder's disability as "Crohn's Disease, anxiety." (AR-0226). Dr. Taitelbaum described Ms. Reeder's physical impairment as a Class 5-severe limitation functional capacity, as well as a Class 5 mental impairment with significant loss of psychological adjustments. (AR-0227-28).

16. Dr. Taitelbaum also states on the APS that Ms. Reeder can stand/walk for 1-4 hours, sit for 3-5 hours, and drive 1-3 hours each day, and can lift approximately 15 pounds. (AR-0227).

17. With respect to her work capabilities, Dr. Taitelbaum merely stated that "she says she cannot work again." In terms of vocational rehabilitation, Dr. Taitelbaum again states that "patient says she cannot work." (AR-0227-228).

18. Upon receipt of Ms. Reeder's claim, Sun Life reviewed and evaluated all of the medical records received from Harvard Vanguard Medical Associates ("HVMA") and her treating physician, Dr. Taitelbaum. Those records revealed that Ms. Reeder had an 18 year history of Crohn's Disease prior to her claim for disability. (AR-0217).

19. The HVMA records that Sun Life reviewed also revealed that on May 15, 2003, Dr. Taitelbaum recorded in her records that Ms. Reeder complained of severe abdominal pain. She then was diagnosed with gallstones. (AR-0210-0206). Despite the problems associated with her gallbladder, Mr. Reeder had no change in her bowel habits. (AR-0199).

20. Ms. Reeder underwent an open cholecystectomy on May 31, 2003 to remove her gallbladder. (AR-0194). Due to the surgery, Ms. Reeder had to discontinue her Remicade treatments. As a result, she began experiencing some rectal inflammation. (AR-0191).

21. Mr. Reeder requested that she be allowed to resume her Remicade treatments. (AR-0181). Before Dr. Taitelbaum would allow Ms. Reeder to resume treatments she ordered a CT scan performed to make sure she had no signs of infection. (AR-0191).

22. A July 8, 2003 CT scan showed no evidence of an exacerbation of her Crohn's Disease. (AR-0154-0155).

23. Ms. Reeder started receiving Remicade infusions again on July 18, 2003. (AR-0185).

24. On July 23, 2003, Mr. Reeder contacted Dr. Taitelbaum's office and requested an appointment because she was "being advised by people to go on disability." (AR-0183).

25. On July 28, 2003, Dr. Taitelbaum completed an APS in connection with Ms. Reeder's claim for short-term salary continuance. In this July 28, 2003 APS, Dr. Taitelbaum stated that Ms. Reeder had recovered from the cholecystectomy and described Ms. Reeder's Physical Limitations as a Class 3, slight limitation due to Crohn's Disease. Dr. Taitelbaum also stated that Ms. Reeder had no restrictions or limitations from her occupation and that she was capable of returning to full-time work. (AR-0070-71).

26. On July 29, 2003, Dr. Taitelbaum noted in her records that Ms. Reeder was "not sure about whether she wants to return to work" and would let her know. Dr. Taitelbaum also noted that Ms. Reeder could contact her nurse to get her "can go back to work note." (AR-0181).

27. Ms. Reeder returned to work part-time from August 25, 2003 through September 18, 2003. (AR-0216A).

28. On September 23, 2003, Dr. Taitelbaum noted that during her appointment Ms. Reeder "began crying and shaking with anxiety, stated that she need[s] to apply for complete disability" due to "embarrassment when she loses bowel movements at work, multiple missed

days, the need for frequent appointments and medications, anxiety, panic attacks on the inability to concentrate." (AR-0174). Dr. Taitelbaum also noted that Ms. Reeder "feels she cannot go back to work" and that Dr. Taitelbaum "would be as supportive as possible about her attempt to have complete disability." (Id.) While Dr. Taitelbaum noted that Ms. Reeder has "severe anxiety and depression," and "Crohn's Disease with severe panic attacks and anxiety" she noted no change in her mental status. (AR-0175).

29.     While Ms. Reeder listed the need for frequent appointments and medications as one of her reasons for needing to go on total disability, in 2003 Ms. Reeder was receiving her Remicade infusion once every 2 months and seeing Dr. Taitelbaum once a month. (AR-0235).

30.     On September 24, 2003, Ms. Reeder was seen for individual psychotherapy with Suzanne Sayle, RN, whose office records reflect that Ms. Reeder had tried to return to work but lost bowel control several times, which increased panic attacks, making work very hard. (AR-0234). According to the record, Ms. Reeder was "helping her sister some, trying to stay on top of the disability process, visiting friends" and "will also look into volunteering and into Curves." (Id.). This is the first and only record of any treatment for Ms. Reeder's mental health issues in the medical records submitted.

31.     As part of Sun Life's evaluation of Ms. Reeder's claim, William Watson, M.D. reviewed the claim file and medical records. (AR-0245-0247). He reviewed the APS forms completed by Dr. Taitelbaum and her clinical notes. Dr. Watson also reviewed a July 28, 2003 APS, which differs from the APS completed by Dr. Taitelbaum in October of 2003. Specifically, the July 28, 2003 APS reported the patient's progress as "recovered from the cholecystectomy," her physical limitation was only a Class 3-slight limitation "due to Crohn's disease," and "could return to work full-time." Dr. Watson concluded that as of July 28, 2003

"Dr. Taitelbaum felt that the claimant had returned to a preoperative capability and was capable of full-time employment." (AR-0246).

32. Dr. Watson observed that subsequent clinic notes of Dr. Taitelbaum describe the claimant crying and complaining of incontinence, however, the examinations during August and September did not reveal any abnormality in the abdomen or rectum. A CT scan performed on July 8, 2003 "to make sure there was no evidence of intra-abdominal complication . . . confirmed that there was no evidence of active disease or abscess." This "indicates no evidence of an exacerbation of her Crohn's Disease and that there was no problem with continuance or capacity at that examination," 5 weeks after surgery. (AR-0246).

33. Dr. Watson noted that although the October 2, 2003 APS lists anxiety as a cause for the disability, there is no mental assessment other than the statement of anxiety in the medical records. (AR-0246).

34. Dr. Watson concluded that from the records and the test results that Ms. Reeder has "quiescent Crohn's Disease with normal physical examinations, no disturbance of sleep, normal BMI, normal CT and blood work. He concluded that "there is no evidence to support a claim of total disability. There are no restrictions or limitations for this disease, other than reasonable access to toilet facilities." (AR-0246).

35. Ms. Reeder's claim was also reviewed on December 8, 2003 by Mary E. Moran-Higgins, RN, POS. (AR-0249). After reviewing the available medical evidence in the file, Ms. Moran-Higgins found that although the claimant has a long history of Crohn's Disease with 2 previous surgical interventions for resections and had a cholecystectomy on May 31, 2003, "she reported doing reasonably well [after the operation,] with an exception of an increase in

liquid stools initially." Based on this information, Ms. Reeder should have had a recovery time of approximately 8 weeks. (AR-0249).

36. Ms. Moran-Higgins also found that the CT scan performed in July showed no evidence of active disease or abscess and also indicated "no evidence of an exacerbation of her Crohn's Disease." (Id.)

37. Ms. Moran-Higgins also reviewed the July 28, 2003 APS, which indicated a Class 3 slight limitation due to Crohn's Disease with a prognosis of a full-time return to work. Ms. Moran-Higgins, like Dr. Watson concluded that the available labs and examinations did not support a finding of total disability. Moreover, Ms. Moran-Higgins noted that while Ms. Reeder's alleged disability is Crohn's Disease plus anxiety there does not appear to be a record of any mental evaluations or treatment for this anxiety. She concluded that the medical records in the file through September 24, 2003 do not support a Class 5 physical impairment. (Id.)

38. By letter dated December 9, 2003, Sun Life denied Ms. Reeder's claim for disability benefits because the medical records after July 29, 2003 do not support a claim that Ms. Reeder is physically unable to perform her job. (AR-0251-0254). Sun Life gave the following reasons as a basis of its decision:

- Ms. Reeder's job as a research adjustment analyst is sedentary consisting of 5.5 hours of sitting; 1/2 hour of standing; 1 hour of walking; occasional bending, stooping; typing on a computer keyboard; and document retrieval from work date boxes.

- Ms. Reeder underwent a cholecystectomy on May 31, 2003 and did reasonably well recovering. A CT scan on July 8, 2003 showed no evidence of exacerbation of Crohn's Disease.

- The July 28, 2003 APS completed by Dr. Taitelbaum indicated that Ms. Reeder had recovered from the cholecystectomy and had slight limitation of functional capacity due to Crohn's Disease. The form indicated no mental impairment and stated that Ms. Reeder was "able to function under stress and engage in interpersonal relations, (no

- limitation)." Therefore, as of July 28, 2003, Ms. Reeder should have been able to return to her occupation.

- The July 29, 2003 office note by Dr. Taitelbaum reflects that Ms. Reeder did in fact not want to go back to work and was considering filing a disability claim. However, all the results of this exam were normal or unchanged from her previous visits.

- The examination notes from August and September do not document any abnormalities or changes in Ms. Reeder's condition. In fact, a September 24, 2003 physicians note indicated that the patient was helping her sister and was going to look for volunteer work and planned to begin exercising at Curves.

- As of July 28, 2003, Sun Life concluded that Ms. Reeder should have been able to return to her occupation and "the medical records past July 29, 2003 do not support your being physically unable to perform your job." (AR-0253).

- The September 24, 2003 note from Suzanne Sayle, RNCS does not support that Ms. Reeder is unable to perform the duties of her occupation and there was no other record of treatment for mental health issues during the elimination period. (Id.)

Sun Life informed Ms. Reeder that because the elimination period did not end until November 10, 2003, and disability was not supported past July 29, 2003, she "did not satisfy the Elimination Period with the required number of days of Total or Partial Disability and therefore no benefits are payable on your claim." (Id.).

39. On September 10, 2004, although not filed within the 180 day time period required by ERISA, Ms. Reeder appealed Sun Life's denial of LTD benefits and submitted additional records for Sun Life's review and consideration. (AR-0260-0265).

40. The records received included a November 19, 2003 letter from the Senior Human Resources Administrator at Sun Life (U.S.), Mary Kowalski. In her appeal letter, Ms. Reeder claims that this letter shows that her employer did not consider her able to perform the essential duties of her job. (AR-0261).

41. However, in the November 19, 2003 letter, Ms. Kowalski states that Ms. Reeder "may resume [her] job position (provided its not filled) or post for other positions." Ms. Reeder's manager, Ralph Milliken indicated that while Ms. Reeder was working part-time she had "stopped performing the complex financial analysis assignments that are the main focus of [her] job position, and instead [ ] only primarily performed more menial tasks such as storage and retrieval of microfilm records.' (AR-0271B). Because Ms. Reeder was not performing her job duties Mr. Milliken did not believe this type of schedule/work assignment could be allowed on a long-term basis. (Id.). The letter does not state that Mr. Milliken thought Ms. Reeder was <u>unable</u> to do her job, only that she <u>was</u> <u>not</u> doing all of her duties during the time she was working part-time.

42. Ms. Reeder submitted a one paragraph August 12, 2004 note signed by Dr. Richard Morrill and Suzanne Sayle, RN, which states: "Laura continues under my care for her symptoms and depression and anxiety related to her poorly controlled Crohn's Disease. Due to the unpredictable nature of her illness, Laura is not able to know when she needs to use the bathroom. When she does experience this she needs to get there quickly. This obviously creates a great deal of anxiety for the patient and she feels that she cannot plan work without interruption. Her anxiety about this complicates her ability to follow directions and engage in conversations in a confident manner . . ." (AR-0272).

43. Ms. Reeder submitted a functional capacity questionnaire, which was part of her application for SSDI. (AR-0273). This questionnaire was completed in January 2004 by Dr. John M. Kaufman, a gastroenterologist. He states that Ms. Reeder is unable to tolerate even low stress jobs due to her severe anxiety and panic attacks. However, he also states that Ms. Reeder can sit and stand for 1-2 hours and that she would need a job that would permit ready

access to a restroom. He states that she would need to take hourly restroom breaks that would require her to be away from her workstation for an average of 10 minutes and that she may only have 2 minutes of advanced notice of her need to take the restroom break. Dr. Kaufman concludes that "the patient's primary limitation is her severe anxiety and panic attacks, along with frequent diarrhea associated with cramping." (AR-0276).

44.     Nurse Suzanne Sayle, a psychiatric nurse also completed a psychiatric functional capacity questionnaire in connection with Ms. Reeder's application for SSDI in February, 2004. (AR0277-0279). Ms. Sayle lists Ms. Reeder's diagnosis as a panic disorder due to her Crohn's Disease. She states that Ms. Reeder's anxiety and panic attacks began in the 80's and that her panic has been exacerbated by her Crohn's Disease. Due to her Crohn's Disease Ms. Reeder is both depressed and often anxious because of her inability to predict the need to go to the bathroom and her lack of control over her bowels. She states that she has been unable to function outside of the highly structured living setting for more than 2 years. However, Ms. Reeder worked full-time at Sun Life for a year and a half of those two years.

45.     Ms. Sayle further states that Ms. Reeder is currently undergoing psychotherapy and is being seen at least once a month and more frequently when necessary. However, not a single medical record of this alleged treatment was submitted. As for her prognosis, since her level of anxiety, panic and depression are related to her Crohn's Disease, and the likelihood of her Crohn's Disease being resolved is poor, Ms. Sayle thinks that her prognosis in itself is poor. (Id.).

46.     Ms. Reeder also submitted a Mental Functional Capacity Assessment ("MFCA") completed by Suzanne Sayle, RN on February 9, 2004 in connection with her application for

SSDI. (AR-0280-0282). In this assessment, Ms. Sayle reported that Ms. Reeder's mental abilities were "markedly limited" with respect to:

- The ability to perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances.
- The ability to complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and lengths of rest periods.
- The ability to travel in unfamiliar places and use public transportation.

In addition, Ms. Sayle stated that Ms. Reeder's ability to concentrate for extended period and interact appropriately with general public is "moderately limited." (AR-0280-0281). All of Ms. Reeder's limitations are due to her need to take frequent restroom breaks. (Id.)

47. However, Ms. Sayle also reported on the MFCA form that Ms. Reeder had no limitations with respect to her understanding and memory; ability to carry out instructions (simple and detailed); sustain ordinary routine without supervision; work in coordination with others; make simple work related decisions; ask questions or request assistance; and accept instructions and respond appropriately to criticism. (AR-0281).

48. On November 5, 2004, Ms. Reeder submitted additional medical records for the period of September 2003 through September 22, 2004.

49. The records received included additional office records from Harvard Vanguard Medical Associates ("HVMA"). These documents are clinic visits and most are by Dr. Taitelbaum, but there are also entries from numerous nurse practitioners and registered nurses. However, none of the records reflect any psychiatric treatment for her alleged anxiety or panic attacks with Dr. Morrill or Nurse Sayle, even though Dr. Morrill and Nurse Sayles are both associated with HVMA. (AR-0272).

50.     Among the HVMA records are notes dated August 3 and 5, 2004, where Dr. Taitelbaum states that Ms. Reeder was doing well and was "asymptomatic." Her weight was also unchanged. Ms. Reeder's Crohn's Disease "was under reasonably good control" and Ms. Reeder had discontinued her Remicade treatments in April 2004 but was starting them again. (AR-0307). This completely contradicts the August 12, 2004 note prepared by Nurse Sayles in support of Mr. Reeder's application for SSDI that describes her Crohn's Disease as "poorly controlled." (AR-0276).

51.     In fact, the HVMA records indicate that Ms. Reeder's Crohn's Disease had been stable since January 2004. On January 24, 2004, Dr. John Kaufman noted that Ms. Reeder told him she had 6 to 8 loose to soft bowel movements daily, and in a rare occasion up to 15 times a day. She has instances of incontinence on average two times a week. (AR-0374).

52.     On April 13, 2004, Dr. Taitelbaum's records indicate that Ms. Reeder is experiencing "intermittent" symptoms due to Crohn's Disease but there is no change in her appetite or weight. (AR-0340).

53.     During her June 17, 2004 appointment, Dr. Taitelbaum noted that Ms. Reeder's condition was "relatively stable" and she looks well. (AR-0318-0319). That same day Dr. Taitelbaum consulted with Ms. Sayle regarding Ms. Reeder's recent complaints of fatigue. Ms. Sayle expressed concern to Dr. Taitelbaum that "we (HVMA) are her [Ms. Reeder's] life." (AR-0317).

54.     Upon receipt of this additional medical information, Sun Life had the entire Administrative Record reviewed by Dr. B.W. Hall on February 15, 2005. (AR-0393-396). After reviewing all of the medical records and evidence before him, Dr. Hall concluded that there was no evidence of any specific complications attributable to the May 31, 2003 surgery that would

have prevented Ms. Reeder from returning to work. He notes that she did continue to have loose bowel movements of varying frequency, however, it did not appear to him that the frequency or character of these bowel movements had changed significantly in the 6 to 8 weeks post-operatively. (AR-0394).

55. Dr. Hall found that Ms. Reeder had an uneventful post-operative recovery from her May 31, 2003 surgery, and from reviewing the office notes from July through September concluded that the claimant did not return to work either part-time or full-time due to "primarily to self-reported symptoms." (AR-0395). Dr. Hall "could find no specific evidence of a change in the clinical condition of the claimant in the period from July-August-September of 2003 compared to the pre-cholecystectomy period prior to May 2003, either with regard to a change in her bowel movements or a change in her symptoms or complaints." (Id.). As a result, he did not see any change in the claimant's medical picture after the May 31, 2003 surgery that would support her ceasing work altogether. (Id.).

56. Dr. Hall found that the claimant underwent an unremarkable recovery from her operation. Given the standard 6 to 8 weeks period of recovery, he felt that her condition was stable effective August 2003 and has been relatively stable since that time. (Id.). Dr. Hall acknowledges that the claimant clearly does have Crohn's Disease and is symptomatic from the condition, however her Crohn's Disease appears to be stable from a symptomatic and clinical point of view in the timeframe beginning in 2003 through September of 2004. (Id.). Her numerous and frequent visits, to the various doctors (although several were unrelated to her Crohn's Disease) as well as her own claims that she is looking into volunteer work and attending Curves (a health club), indicate, in Dr. Hall's opinion, that the claimant is or should be capable at

the very least of sedentary work activities if not light work activities on at least a part-time basis. (AR-0396).

57. Although what appears to be the most incapacitating for the claimant are her frequent bowel movements, Dr. Hall notes that in reviewing her physical examinations, Ms. Reeder's weight has remained largely unchanged at about 150 pounds. (Id.). In Dr. Hall's experience, "patients with active, symptomatic Crohn's Disease are struggling to maintain their weight and are generally losing weight and most of them tend to be down to 100 to 110 lbs." (Id.).

58. Based on the evidence in the previous denial, as well as Dr. Hall's medical review, Sun Life upheld its decision to deny Ms. Reeder's claim for long-term disability benefits. In its denial letter dated March 1, 2005, Sun Life explained that in order to qualify for benefits, Ms. Reeder must satisfy the Policy definitions of either total or partial disability. (AR-0397-0401). In addition, Ms. Reeder must satisfy the 180 day elimination period before any long-term disability benefits are due. Because Ms. Reeder stopped working on May 15, 2003, the elimination period was not completed until November 10, 2003. (AR-0397).

59. Relying on information from her employer, Sun Life found that in an 8 hour day, Ms. Reeder's occupation as a research/adjustment analyst requires 6.5 hours of sitting, .5 hours standing, and 1 hour walking. She has the ability to change positions at will. Ms. Reeder types on a computer keyboard and retrieves documents from work date boxes; however, lifting is not a material and substantial duty. This level of work is defined in the United States Department of Labor's "Dictionary of Occupational Titles" as sedentary work. It is this level of work that Ms. Reeder must be unable to perform in order to satisfy the Policy definition of total disability. Medical documentation must establish such an inability. (AR-0397-0398)

60. Sun Life, citing to 1) the July 28, 2003 APS from Dr. Taitelbaum indicating that Ms. Reeder could perform her own occupation on a full-time basis, had no mental impairment and stating that Ms. Reeder could work up to a light work capacity given her Crohn's Disease; 2) the three medical reviews performed; and 3) the additional medical records submitted, concluded that "the medical records, [ ] do not document a change in Ms. Reeder's chronic condition. She was able to perform her occupation with her symptoms prior to her May 31, 2003 surgery, so it appears she would have been able to return to that occupation following her recovery from surgery." (AR-0400).

61. Sun Life also points out in its denial that although Dr. Hall questioned whether or not Ms. Reeder could work part-time, Ms. Reeder is ineligible for partial disability because her coverage ended when she was capable of returning to work but did not do so. (AR-0400).

62. Therefore, Sun Life concluded that "[t]he medical records do not establish a change in Ms. Reeder's chronic condition that necessitated her remaining out of work following her recovery from surgery in May of 2003. Although Ms. Reeder worked part-time from August 25 through September 18, 2003, she did not satisfy the entire elimination period with a combination of total and partial disability. For these reasons, Sun Life concluded that the denial of her claim was appropriate and must be maintained." (AR-0400).

SUN LIFE ASSURANCE COMPANY OF CANADA, INC.

By its attorney,

/s/ Kristina H. Allaire
Joan O. Vorster, Esq., BBO #550375
Kristina H. Allaire, Esq., BBO #646001
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: June 28, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 28, 2006.

/s/ Kristina H. Allaire
Kristina H. Allaire, Esq.

Dated: June 28, 2006