UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA R. REEDER, ) | Case No.: 05-10534-NMG |
| ) | |
| Plaintiff, ) | PLAINTIFF'S MEMORANDUM IN |
| ) | SUPPORT OF MOTION FOR SUMMARY |
| vs. ) | JUDGMENT |
| ) | |
| SUN LIFE ASSURANCE COMPANY OF ) | |
| ) | |
| CANADA, INC., ) | |
| ) | |
| Defendant | |

## Applicable Law

This is an action under the Employee Retirement Income Security Act of 1974, (ERISA), 29 U.S.C.S. section 1132(a), and section 1132(a)(3) to review the Defendant's decision to terminate Plaintiff's Long Term Disability Benefits.

## Standard of Review

A denial of benefits under ERISA is to be reviewed under the *de novo* standard unless the benefit plan specifically gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. When the grant of discretionary authority is found, the court applies a deferential arbitrary and capricious standard of judicial review. *Firestone Tire & Rubber Co. v.* Bruch, 489 U.S. 101, 111-15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 828 (1st Cir.1997) Under that standard, the decision of the administrator will be upheld if it is supported by substantial evidence in the record. *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104,109, (1st Cir.1997) This deferential standard of review, however, does not apply where the facts reveal a genuine conflict of interest. *Doyle v. Paul Revere Life Insurance Company*, 144

F.3d 181 (1st Cir.1998).  There must be more evidence of a conflict, however, than having an insurance company also act as plan administrator.  *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 419 (1st Cir.2000).  Other Circuits have extended the standard of review to "heightened scrutiny" where an insurance company both funds and administers an ERISA benefits plan, ruling that the combination of such fiduciary and non-fiduciary roles creates an inherent conflict of interest.  *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3rd. Cir.2000) (Heightened scrutiny is required when an insurance company is both plan administrator and funder.)  (Claimant beneficiary was employee of plan administrator's client, Rhone-Poulenc Corporation); *Kosiba v. Merck & Co.*, 384 F.3d 58 (3rd Cir.2004).

Additionally, ERISA generally requires that assets of a benefits plan be "held in trust by one or more trustees".  29 U.S.C. sec. 1103(a).  This requirement is excepted for insurance companies.  29 U.S.C., sec. 1103(b)(1).  Therefore, the most important reason for the deferential standard of review in non-insurance company administered ERISA claims is lacking.  *Pinto*, at 389.

**<u>Argument</u>**

The plaintiff, Laura Reeder, is 46 years old, DOB: 4/07/1960.  She worked as a research/adjustment analyst for Sun Life for approximately nineteen (19) years, beginning in 1984.  She was a participant in the defendant's employee benefit plan, making contributions from her wages toward the premiums for both short and long term disability benefits.  The plan is underwritten by Sun Life Assurance Company of Canada. (AR, pg. 0031)  Sun Life also funds the plan.  (AR, pg. 0066)

Ms. Reeder suffers from longstanding Crohn's disease with multiple surgical resections and perianal/rectal abscesses. (AR, pgs. 0290, 0291)  Her treatment has been complicated by her intolerance of various medications, causing nausea and vomiting. (AR, pg. 0394)  Her intolerance of these medications has prevented her from benefiting from full therapeutic doses.

(AR, pg. 395-396) She continues to remain symptomatic despite treatment. (AR, pg. 0395) Dr. B. W. Hall, the reviewing doctor hired by the defendant to review her claim, confirmed that her symptoms persisted following her last surgery, and stated that work activity on a full time basis would be questionable. (Tr., pg. 396) He also states in his report that, "Unfortunately, there are a lot of variables in this individual's clinical situation which not only include the underlying inflammatory bowel disease, which has been diagnosed as Crohn's disease, but also the associated anxiety, depression, and panic attacks." (AR, pg. 396)

Ms. Reeder has had two bowel resections, one a small bowel resection with an appendectomy in 1994, a subtotal colectomy in 1996, leaving her with a small colon pouch, and a rectal incision and drainage in October of 2000. On May 31, 2000, she underwent a cholecsystectomy (surgery for gall bladder removal), a common complication of Crohn's disease.

Ms. Reeder applied for, and was granted, a medical leave of absence by Sun Life on or about June 19, 2003, and was also awarded a short term salary continuance as well, following surgery to remove her gall bladder. Leave was granted starting from April 28, 2003, approximately one month before her surgery. Documentation to support this leave was of course required by Sun Life and provided by plaintiff during her leave period. On or about August 11, 2003, Sun Life sent plaintiff a letter that her twelve week Family and Medical Leave Act (FMLA) leave time was to expire on August 6, 2003, and that her position may have to be filled. The same letter requested documentation for plaintiff's return to work on August 18 for five hours per day. (AR, pg. 84) On August 15, 2003, her treating physician provided a letter to defendant stating that Ms. Reeder had been out of work due to her severe Crohn's disease, and that she also suffered from panic/anxiety disorder as a result of her disease. She stated that Ms. Reeder was suffering from daily diarrhea, with loss of bowel control, nausea, low grade fevers, and severe fatigue which kept her from returning to work . (AR, pg. 80).

Office notes show that following her surgery, Ms. Reeder experienced a flare in all of her symptoms. Office notes from 6/20/2003 show that her unwell feelings persisted following surgery, even though her severe pain from the surgery itself had subsided. (AR, pg.117) She experienced proctitis and diarrhea, poor intake, heat intolerance. On 6/24/2003, physical exam showed pain and irritation. Dr Teitelbaum states, "She looks tired." (AR 115) Return to work was delayed until further Remicaid treatment. Notes indicate that Ms. Reeder would need a note in order to return to work. (AR, pg. 114) Notes further state that plaintiff was slated to return to work part time on 8/4/03, but wanted to talk about her medical condition.

On or about August 25, 2003 plaintiff tried to return to work part-time, when she was told by defendant that her FMLA benefits were exhausted as of August 6, 2003, (AR, pg. 271A) but was forced to leave on September 18, 2003 when her supervisor complained that she was unable to perform the essential duties of her job (AR, Pg. 271B) In a letter dated October 9, 2003, plaintiff's short term salary continuance was extended to November 12, 2003. In that same letter, plaintiff's senior human resources administrator informed her about filing for long term disability benefits, and enclosed the forms to apply. She was also told in the same letter that her position was being filled because regular and predictable full-time attendance was an essential function of her job. (AR, pg. 271B) She was told, "As you know, you exhausted the maximum 12 weeks of job-protected leave time permitted under the Family and Medical Leave Act on August 6, 2003, more than two months ago, as indicated in one of my earlier letters. The current job position that you hold is one where regular and predictable full-time attendance is an essential function of the job. Therefore, for this and other business reasons, your manager has determined that it is necessary to seek to fill your position at this time. When you are ready to return to work, you may apply for open positions for which you are qualified that may be available at that time." (AR, pg. 271B) There is no mention in the letter of the availability of partial benefits under the terms of the Plan. (AR, pg. 9)

In defendant's letter of November 19, 2003 to plaintiff, Mary Kowalski, Senior Human Resurces Administrator for Sun Life, states that plaintiff's manager, Ralph Milliken, "[H]as" indicated that working full-time and performing all of the varied assignments of your job position are essential functions of that job position.  Sun Life has no obligation to forego, waive or reduce essential functions of a job position."  (AR, pg. 271B)  The letter further states, "Before you went out on your most recent leave, Mr. Milliken had allowed you to reduce your hours on a **temporary** (emphasis taken from text) basis only.  In fact, he had specifically advised you that this was just a temporary accommodation, and that he was not prepared to consider whether it could be done on any long term basis.  In order to make a reduction in hours "workable", he also found that you stopped performing the complex financial analysis assignments that are the main focus of your job position, and instead you only primarily performed more menial tasks such as the storage and retrieval of microfilm records."  (AR, pg. 271A)  It is clear that plaintiff was unable to perform her essential job functions adequately, a judgment made by the people in the best position to make that judgment.

     The Plan's definition of disability is defined as the inability to perform all of the material and substantial duties of her occupation. (AR pgs. 9, 64)  Partial disability is defined as the inability to perform all of the material and substantial duties of her own occupation on a full-time basis, but with the capacity to perform at least one of the material and substantial duties of her own occupation or another occupation on a part-time or full-time basis; and the inability to earn more than 80% of her total monthly earnings. (AR, pg. 9)  Plaintiff has since been terminated from her employment with defendant.

Plaintiff has treated for her Crohn's disease for over 20 years.  Her treatment has been continuous and consistent throughout her history with defendant.  Dr. Hall's report states that the voluminous records from Harvard Vanguard reflect frequent and regular visits, (at least one visit per month, but generally twice per month clinical visits are recorded.)  (AR, pg. 393)  The record

refers to the additional medical issues usually associated with Crohn's, the anxiety over the unexpected recurrence of incontinence and toileting accidents, the additional role that stress plays in triggering symptoms. (AR, pgs. 94, 175, 80, 272, 273-76, 277-79, 280-82) Of particular significance, however, with Dr. Hall's report, is that he makes no reference to any of the written reports provided by Ms. Reeder in her final appeal. He does not mention the report of her treating physician, John M. Kaufman, M.D., of West Roxbury, MA, which relates her continued problems with incontinence following her cholecystectomy. (AR, pgs. 273) He states that she experienced diarrhea 7 to 8 times per day, up to 15. (AR, 273). Dr. Hall also did not mention Dr. Kaufman's reference to Ms. Reeder's anxiety over her condition, where he states, "Patient has severe anxiety and panic attacks. Fear of fecal incontinence may contribute to this." (AR, pg. 274) He also states that emotional factors contribute to the severity of plaintiff's symptoms. (AR, pg. 274)

  Dr. Hall similarly fails to make reference to the report filed by Ms. Reeder's treating psychiatrist, Richard Morrill, M.D., which outlines in detail the restrictions caused by her condition. Dr. Morrill states, "Routine stress often pushes patient's anxious state into panic. This is especially true when she is not feeling well due to symptoms of Crohn's (fever, diarrhea, fatigue)." (AR, pg. 278) Dr. Hall also did not mention Dr. Morrill's functional evaluation, where he indicates that the plaintiff is markedly restricted in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (AR, pg. 280) This assessment was confirmed by Ms. Reeder's own supervisor, Mr. Milliken. (AR., pg. 271B) If defendant seriously questioned the truthfulness of any of these reports from Ms. Reeder's treating physician's, it should have had Dr. Hall review and comment on them. It apparently did not. It is clear that the only records Dr. Hall was working with were Harvard Vanguard notes. Failure to review all the records available in determining eligibility for benefits may render a decision denying benefits as not supported by the substantial evidence of record.

*Cook v. Liberty Life Assurance Co. of Boston*, ___F.3d___, (1st. Cir.2003) (Reasonableness of decision is dependent on the evidence available to insurer), (citing *Pari-Fasano*, 230 F.3d at 419) See also, *Giannone v. Metropolitan Life Insurance Company*, 118 F.3d 820. (Minimal evidence on which MetLife relied when weighed against a documented 15 year medical history and the uniform opinion of a half-dozen treating physicians). Dr. Hall also incorrectly states that Ms. Reeder did not return to work following her surgery, stating that she decided not to due to self-reported symptoms. (AR, pg. 395) It is clear that he did not have a complete and/or accurate record to review, and defendant's denial of benefits is not supported by substantial evidence.

The medical record is replete with references to Ms. Reeder's continued symptoms following her surgery. Her immediate pain following the surgery did resolve, but her underlying incontinence and the anxiety it produced continued on. The fact that her CT scan of 2003 was within normal limits does not reflect that she was symptom free. It merely shows that her surgery was healed, and there were no active lesions. Defendant's own doctor indicated that with her history of multiple bowel resections, continued diarrhea would be expected. (AR, pg. 396) The consensus of all of Ms. Reeder's treating clinicians, her work associates, and her the evidence in the record supports the ongoing seriousness of her symptoms. Defendant's own doctors were in disagreement as to Ms. Reeder's restrictions. The earlier opinion offered by W.W. Watson, M.D. in 2003 states that there are no restrictions for her, except for being near a bathroom. The later opinion by Dr. Hall states that full time work would be doubtful. (AR, pg. 396) Courts have recognized that a change or disagreement over diagnosis by a non-treating, non-examining physician without consulting with the treating physician is not accepted medical practice. *Vargas v. Sullivan*, 898 F.2d 293, 295 (2nd Cir.1990) (A medical advisor's assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.)

Office notes of 3/5/2002 by Ms. Reeder's primary physician, Renee Remily, M.D. indicate that Ms. Reeder was experiencing heart palpitations, from 67 to 132 beats per minute. She reported feelings of light headedness and dizziness. This was despite her then current medications for anxiety, including Klonopin, 0.5 mg., up to three times a day, and alprazolam (Xanax), 0.25 p.r.n. Her clinicians were obviously trying to address her problems with anxiety.

Ms. Reeder was referred by Dr. Remily to a cardiologist for her frequent ventricular premature beats. She consulted Eugene H. Lindsey, M.D. on 4/25/2002. He describes her as a 42 year old woman with a long history of "very complicated Crohn's disease." He states that she "[H]as had a colectomy with reanastomosis at the rectum, but has had continued symptoms, which have forced her to have chemotherapy, for which she received infusions." It was during one of her infusions that she experienced significant heart palpitations. She had been prescribed a Holter monitor in March of that year, which demonstrated approximately 20,000 unifocal premature beats a day. The symptoms were mostly resolved with the use of progesterone therapy for symptoms related to her menses. Dr. Lindsey concluded that Ms. Reeder's palpitations were benign, though, and stated, "I think that her anxieties might play a role in it." By 6/20/2002, office notes by Dr. Remily state that, "[H]er Crohn's colitis has now taken front step in the sense that she needs to take off time from work to have medical care and she is now finding that this is becoming a problem for her." Dr. Remily further states, "She also is finding that her panic attack is now worsening and again this has been interfering with being able to work on a consistent basis. " She then reports, "She has other medical problems too that have [arisen], which seem to complicate the issues . . ." Finally, the note states, "[H]er feeling is that there is a possibility that she will [lose] her job just because of her illnesses, and so she is here today for consultation as to whether she would be a good candidate for disability and we had a long discussion about this." Dr. Remily concludes that,

"Patient has a good case for multiple illnesses, which interfere with her work abilities and so we will have her apply and we will fill out proper paper work."

Ms. Reeder was awarded Social Security disability benefits on her initial application filed in 2004. Her onset date was May 15, 2003, her last day of full time work for defendant. (AR, pg. 266)

## Conclusion

For the above reasons, plaintiff states that the decision of the defendant denying her long terms disability benefits was not supported by substantial evidence, was arbitrary and capricious, and should be reversed.

Dated this 29th day of June, 2006

*/s/ Lindsay P. Rand*
Lindsay P. Rand, BBO#411550
654 Washington Street
Braintree, MA  02184
Phone: 781 849-9844
Fax: 781 848-2308
*lprand@comcast.net*

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants asn identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 29, 2006.

*/s/ Lindsay P. Rand*
Lindsay P. Rand

Dated: June 29, 2006